```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
S.A.M., B.A.S., M.N.N., S.D.,
A.A.S., and INTERNATIONAL
REFUGEE ASSISTANCE PROJECT,
INC.,

                 Plaintiffs,

           - against –

UNITED STATES DEPARTMENT OF
STATE, MARCO RUBIO, in his
official capacity as Secretary
of State, and DON BROWN, in his
official capacity as Afghan
Special Immigrant Visa
Coordinator,

                 Defendants.

-------------------------------X
```

**MEMORANDUM AND ORDER**

24 Civ. 7656 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs S.A.M., B.A.S., M.N.N., S.D., and A.A.S. ("Individual Plaintiffs") and International Refugee Assistance Project, Inc. ("IRAP," and together with the Individual Plaintiffs, "plaintiffs") bring this action against defendants U.S. Department of State ("State Department"), Marco Rubio, in his official capacity as Secretary of State, and Don Brown, in his official capacity as Afghan Special Immigrant Visa Coordinator

(together, "defendants")[1], seeking a declaratory judgment and injunctive and equitable relief.

Presently before the Court is defendants' motion to partially dismiss plaintiffs' Amended Complaint ("AC") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Specifically, defendants contend that: (i) the Afghan Allies Protection Act ("AAPA") does not provide a private right of action; (ii) plaintiffs cannot assert a claim under the Administrative Procedure Act ("APA"); (iii) plaintiffs cannot assert a valid claim under the Accardi doctrine; (iv) plaintiffs fail to state a claim upon which relief can be granted; (v) IRAP lacks standing as to claims not brought under the Freedom of Information Act ("FOIA"); and (vi) certain of the Individual Plaintiffs' claims are unripe.[2] Defendants do not move to dismiss plaintiffs' FOIA claims. For

---

[1]    Plaintiffs' original complaint, filed in October 2024, named Antony Blinken, then Secretary of State, as a defendant.  ECF No. 1.  Marco Rubio has since replaced Antony Blinken as Secretary of State and is named in plaintiffs' Amended Complaint.  ECF No. 23.  Antony Blinken is therefore terminated from this action pursuant to Federal Rule of Civil Procedure 25(d).

[2]    The Court need not consider the parties' arguments concerning ripeness in light of the State Department's announcement that, as of January 1, 2026 and "in line with Presidential Proclamation 10998 on 'Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States,'" the State Department is "fully suspending visa issuance to nationals of Afghanistan," including all Afghan Special Immigrant Visas.  See Special Immigrant Visas for Afghans – Who Were Employed by/on Behalf of the U.S. Government, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html (last accessed Feb. 2, 2026).

the reasons stated herein, the Court grants defendants' motion to partially dismiss.[3]

## I.   Factual Background

### a. The Afghan Special Immigrant Visa Program

Congress passed the Afghan Allies Protection Act ("AAPA") in 2009, enabling certain Afghan nationals who were employed by or on behalf of the U.S. government (or by an allied mission) to immigrate to the U.S. through a pathway known as the Afghan Special Immigrant Visa ("SIV") program.  AC ¶ 25; see also Pub. L. 111-8, 123 Stat. 807 (2009).  The SIV program also permits eligible individuals who are already in the U.S. to become lawful permanent residents.  AC ¶ 25.  The AAPA specifies four criteria for eligibility to apply for an SIV: (i) status as a citizen or national of Afghanistan; (ii) past or present employment by or on behalf of the U.S. government on or after October 7, 2001; (iii) "faithful and valuable service" to the U.S. government, documented in a positive recommendation or evaluation from a supervisor; and (iv) an ongoing serious threat as a consequence of employment by the U.S. government.  AC ¶ 26; AAPA § 602(b)(2)(A).

---

[3]     In their opposition filed on May 23, 2025, plaintiffs sought oral argument on defendants' motion.  ECF No. 31.  However, the Court has concluded on the basis of the parties' submissions that oral argument is unnecessary.  See Mir v. Shah, 2012 WL 6097770, at *4 (S.D.N.Y. Dec. 4, 2012); see also Katz v. Morgenthau, 892 F.2d 20, 22 (2d Cir. 1989).

To fulfill the third criterion, the AAPA requires that the recommendation or evaluation from a supervisor be "accompanied by approval from the appropriate Chief of Mission . . . who shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service[.]"  AC ¶¶ 27, 29-31; AAPA § 602(b)(2)(D)(i). This required step in the SIV application process is referred to as Chief of Mission ("COM") approval.  Approval must be obtained from the COM or COM designee.[4]  AC ¶¶ 27, 29-31; AAPA § 602(b)(2)(D)(i).

Applicants must submit documents and information evidencing their eligible employment, including the application form itself, a letter of recommendation, a letter of employment, and identity documents, by email to the State Department's National Visa Center ("NVC").  AC ¶¶ 37-39.  Once submitted, the Afghan Special Immigrant Visa Unit ("ASIV") reviews the application, verifies the submitted information and documents, and makes a recommendation to

---

[4]    The COM is the "principal officer in charge of a U.S. diplomatic mission abroad."  AC ¶ 30 n.2.  Prior to the closure of the U.S. Embassy in Kabul, the COM was the U.S. Ambassador to Afghanistan.  Id.  Although there is no current COM to Afghanistan, the AAPA permits the responsibility for approving applicants for the SIV program to be designated to another official.  Id.  The State Department has designated the head of the Afghan Special Immigrant Visa Unit ("ASIV") as the COM designee.  Id.

the COM designee.  Id.  ¶¶ 40-47.  As part of that process, ASIV may research the employer's government contract information or refer the case for additional review.  Id.  ASIV writes a case explanation addressing relevant factors bearing on the approval or denial.  Id.  That recommendation and explanation are provided to the COM designee for final approval or denial.  Id.

Applicants who receive COM approval can proceed to the next step of the visa application process, which includes submitting a DS-260 form (if the applicant is outside the U.S.) and other supporting documents as part of the visa application package.  Id. ¶ 28; see also The Steps of the Afghan SIV-Process, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov/steps-of-the-afghan-siv-process.html (last accessed Feb. 2, 2026) (hereinafter, "The Steps of the Afghan SIV-Process").  If inside the U.S., the applicant can submit a petition for special immigrant status and/or application for permanent residency.  AC ¶ 28; The Steps of the Afghan SIV-Process.  Applicants must then obtain, scan, and email to the NVC several required documents, including birth certificate, passport, a completed Refugee Benefits Election Form, and a completed Special Immigrant Visa Biodata Form (DS-0234).  The Steps of the Afghan SIV-Process.  If and when the NVC

receives the required documents, the applicant is informed that their case is documentarily complete.  Id.  The NVC determines if the applicant's case is ready for an interview and schedules an interview subject to appointment availability.  Id.  An eligible applicant will then interview with a consular officer.  Id.  If confirmed eligible, the applicant must complete a medical examination after the interview and get the requisite vaccinations.  Id.  Only then will the applicant be issued an SIV.

On the other hand, in accordance with the AAPA, applicants who are denied COM approval "shall . . . receive a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination[.]"  AC ¶ 32; AAPA § 602(b)(2)(D)(ii)(I)(aa).  A State Department cable repeats the instruction that a written decision denying COM approval "must contain, to the maximum extent feasible, [sensitive but unclassified] or lower information describing the basis for the denial, including the facts and reasoning leading to the denial." ECF No. 23-1 ("Cable") at 3.  The Cable provides that "[a]pplicants denied based on classified information should be informed that the information leading to the denial may not be shared with the applicant due to its sensitivity."  Id.

COM decisions are documented in final decision agendas, which are entered into ASIV's case management system.  AC ¶¶ 45-46.  Once the decisions are entered into ASIV's system, approval and denial letters are sent to each applicant.  Id. ¶ 48.  The text included in a denial letter is prepared at the same time as the case explanation provided to the COM designee.  Id. ¶ 49.  Applicants are entitled to one written appeal of COM denial within 120 days and "may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information."  Id. ¶ 35; AAPA § 602(b)(2)(D)(ii)(I)(bb).  ASIV reviews appeals of COM denials, as well as cases previously granted COM approval that are sent back to ASIV for reconsideration and possible withdrawal.  AC ¶ 47.

### b. Plaintiffs' Allegations Concerning COM Denial Letters

Individual Plaintiffs S.A.M., B.A.S., M.N.N., S.D., and A.A.S. are Afghan nationals who received COM denial letters.  Id. ¶¶ 15-19.  IRAP is a non-profit legal aid advocacy organization that provides legal representation to refugees and other displaced persons, including to Afghan SIV applicants generally and the Individual Plaintiffs specifically.  Id. ¶ 20.  Plaintiffs allege that, as a matter of policy and in violation of the AAPA, ASIV omits from COM denial letters the facts and inferences underlying

the denial and does not inform applicants if their denial is based on classified information.  Id. ¶ 51.  Rather, plaintiffs allege that ASIV selects one or more of five boilerplate denial bases: (i) derogatory information associated with the case; (ii) lack of qualifying employment by or on behalf of the U.S. government or by the International Security Assistance Force ("ISAF")/Resolute Support ("RS"); (iii) lack of sufficient documents to make a determination; (iv) lack of faithful and valuable service; and/or (v) insufficient length of employment.  Id. ¶ 53.  Plaintiffs further allege that ASIV may input stock language for the text of the letter, which is limited to a few lines, or may not include any additional text regarding the denial.  Id. ¶ 54-56.

In addition, plaintiffs allege that, pursuant to ASIV's Standard Operating Procedures, ASIV does not make case-by-case determinations about what facts and inferences underlying the individual denial to include in the denial letters.  Id. ¶ 58. Plaintiffs also allege that the Standard Operating Procedures direct ASIV to copy and paste from a list of pre-written denial reasons for the text of the denial letter.  Id. ¶ 59. As a result, plaintiffs argue that applicants receive COM denial letters that omit information necessary for applicants to understand why their application was denied or to prepare an appeal or new application,

effectively and wrongfully preventing them from applying for an SIV.  Id. ¶ 62.

### c. Individual Plaintiffs' COM Denial Letters

Each of the Individual Plaintiffs received COM denial letters, the contents of which are summarized below.

### i. S.A.M.

On November 3, 2021, S.A.M. received COM approval and applied for an SIV at the U.S. Embassy in Islamabad, Pakistan on November 14, 2022.  ECF No. 30 at 1-2; ECF No. 30-1.  After a consular officer refused his application and placed it in administrative processing, the COM withdrew approval by letter dated January 23, 2024.  ECF No. 30 at 1-2.  S.A.M. appealed the withdrawal on March 27, 2024, and the appeal remains pending.  Id.

The COM denial letter stated that "new information [had] come to [the COM's] attention[.]"  ECF No. 30-2.  Specifically, the letter listed "[d]erogatory information associated with the case" and "[l]ack of [q]ualifying employment by or on behalf of the [U.S. government] or by ISAF/RS" as the bases for denial.  Id.  The letter further stated that S.A.M. "did not meet the requirement of faithful and valuable service to the U.S. government."  Id.

### ii. B.A.S.

B.A.S. submitted four applications for COM approval, all of which were denied. ECF No. 30 at 2; ECF No. 30-3. The COM denied the most recent application on November 26, 2024. ECF No. 30 at 2. The next day, B.A.S. appealed the decision, but the NVC did not deem B.A.S.'s appeal complete. Id. In March 2025, the NVC informed B.A.S. that he had until July 15, 2025 to complete his appeal, at which time his case would be submitted to the COM. Id. On May 29, 2025, B.A.S. withdrew his appeal. ECF No. 34 at 1.

The COM denial letter listed "[l]ack of [q]ualifying employment by or on behalf of the [U.S. government] or by ISAF/RS" as the basis for denial. ECF No. 30-3. Specifically, the letter stated that B.A.S.'s employment letter was "insufficient evidence of qualifying employment by or on behalf of the United States government." Id. The letter further instructed B.A.S. to "provide evidence of qualifying employment with a different employer and submit a new letter of recommendation signed by a supervisor associated with the new employer." Id.

### iii. M.N.N.

On December 18, 2017, M.N.N. received COM approval and applied for an SIV at the U.S. Embassy in Kabul, Afghanistan on February 20, 2019. ECF No. 30 at 2; ECF No. 30-4. After a consular officer

refused his application and placed it in administrative processing, the COM withdrew approval by letter dated August 7, 2023.  ECF No. 30 at 2; ECF No. 30-5.  M.N.N. appealed the withdrawal on August 9, 2023, and the appeal was denied by COM on September 14, 2023.  ECF No. 30 at 2; ECF No. 30-6.  On September 21, 2023, M.N.N. submitted a new application for COM approval and submitted relevant documentation.  ECF No. 30 at 2.  That application remains pending.  Id.

The withdrawal letter listed a "[l]ack of sufficient documents to make a determination" as the basis for withdrawal. ECF No. 30-5.  Specifically, the letter stated that M.N.N. "did not provide a valid letter of recommendation" with his application. Id.  The letter instructed M.N.N. to "submit a new letter of recommendation from another supervisor" and provided a link describing requisite information that a recommendation letter must contain.  Id.  The COM denial letter listed "[d]erogatory information associated with case" and "[l]ack of faithful and valuable service" as the bases for denial.  ECF No. 30-6.  The

letter stated that M.N.N.'s employment was "terminated for cause."
Id.

### iv. S.D.

S.D. was denied COM approval by letter on December 20, 2023.
ECF No. 30 at 3; ECF No. 30-7.  On March 22, 2024, S.D. appealed
the denial, which remains pending.  ECF No. 30 at 3.

The COM denial letter listed a "[l]ack of sufficient documents
to make a determination" as the basis for denial.  ECF No. 30-7.
Specifically, the letter stated that S.D. "did not provide a valid
employment letter" with his application and that the COM was
"unable to confirm the authenticity of the employment document."
Id.  The letter instructed S.D. to "provide a new letter of
employment or provide a statement, preferably from your former
supervisor, explaining why a letter of employment is not
available."  Id.

### v. A.A.S.

A.A.S. applied five times for COM approval, plus an additional
two times where the cases were deemed duplicate, and the COM denied
four of the five applications.  ECF No. 30 at 3.  A.A.S. appealed
those four denials, and the COM denied them.  Id.  The COM denied
A.A.S.'s most recent appeal by letter on January 8, 2024.  Id.;
ECF No. 30-8.  On March 23, 2025, A.A.S. submitted a second appeal,

-12-

which remains pending.  ECF No. 30 at 3.  A fifth application submitted by A.A.S. also remains pending.  Id.

The COM denial letter listed "[d]erogatory information associated with the case" as the basis for denial.  ECF No. 30-8.  Specifically, the letter stated that the documents that S.D. submitted with his COM application "were confirmed as fraudulent" and that "[c]ommitting fraud is incompatible with the standards for the Special Immigrant Visa Program."  Id.

## II.  Procedural Background

Plaintiffs filed their original complaint on October 9, 2024.  ECF No. 1.  On November 15, 2024, the Individual Plaintiffs requested a pre-motion conference for a proposed motion for leave to proceed under pseudonym.  ECF No. 12.  The Court permitted the Individual Plaintiffs to proceed under pseudonyms on November 20, 2024.  ECF No. 16.  On January 31, 2025, defendants requested a pre-motion conference for a proposed motion to partially dismiss plaintiffs' complaint. ECF No. 19.  Plaintiffs filed an opposition to defendants' request on February 5, 2025.  ECF No. 20.  On February 20, 2025, the Court permitted defendants to bring their motion without the necessity of a pre-motion conference and granted plaintiffs leave to file an amended complaint by March 13, 2025.  ECF No. 21.

Plaintiffs filed their Amended Complaint on March 13, 2025. ECF No. 23.  On May 2, 2025, defendants filed a motion to partially dismiss plaintiffs' Amended Complaint, along with an accompanying memorandum of law ("Mot.") and declaration in support thereof. ECF Nos. 28-30.  Plaintiffs opposed on May 23, 2025 and, six days later, filed a notice of errata attaching a corrected memorandum of law in opposition to defendants' motion.  ECF Nos. 31, 34-2 ("Opp.").  Defendants filed a reply memorandum in support of their motion on May 30, 2025.  ECF No. 35 ("Reply").

## III. Legal Standard

### a. Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) must be granted when a district court lacks the constitutional or statutory power to adjudicate a claim.  Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).  A plaintiff has the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000). While the Court "must accept as true all material factual allegations in the complaint," J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004), "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it,"

-14-

Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

### b. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikon Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

## DISCUSSION

Defendants move to partially dismiss plaintiffs' Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

Rules of Civil Procedure.  The Court considers each basis for dismissal in turn.

## I.    Rule 12(b)(1)

### a. Plaintiffs' Claim Under the AAPA

Plaintiffs allege that defendants violated the AAPA by issuing COM denial letters that did not provide, to the "maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination."  AC ¶¶ 50-51, 149-52.  Plaintiffs further allege that defendants violated the AAPA by having a "policy or practice of omitting from denial letters the information describing the basis for the denial, including the facts and inferences underlying the individual determination, to the maximum extent feasible." Id. ¶¶ 50-51, 153-55.  Defendants, however, argue that plaintiffs' AAPA claim fails because the AAPA does not provide a private right of action.  Mot. at 7-11.  Specifically, defendants contend that § 602(b) of the AAPA does not include a private right of action to permit challenges to defendants' actions, and that nothing in the text of the statute suggests an intent to permit such challenges.[5]

---

[5]    Defendants further argue that finding an implied right of action to challenge the Afghan SIV process would be "particularly inappropriate" given the doctrine of consular nonreviewability.  Mot. at 9-11.  Because the Supreme Court recently held that the "doctrine of consular nonreviewability is not jurisdictional," the Court will instead examine the doctrine in the context of

Id. at 7-9.  Plaintiffs acknowledge that the AAPA does not provide an explicit right of action but argue that the Court should recognize an implied right of action based on the statute's purported "rights-creating language" and the absence of an "explicit enforcement mechanism that would suggest an intent to foreclose a private remedy."  Opp. at 21-22.

It is well-settled that "private rights of action to enforce federal law must be created by Congress," and the existence of a private right of action must be clear on the face of the statute that a party is relying on to enforce.  Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).  Courts "therefore begin . . . [the] search for Congress's intent with the text and structure of [the statute]."  Id. at 288.  In reviewing the text, if "a statute does not include this sort of explicit . . . language, [a court] rarely impute[s] to Congress an intent to create a private right of action."  Gonzaga Univ. v. Doe, 536 U.S. 273, 284 n.3 (2002).  Where Congress has not explicitly created a statutory right of action, the next step in the analysis is to determine whether one can nevertheless be implied.  See, e.g., Oxford Univ. Bank v. Lansuppe Feeder, LLC, 933 F.3d 99, 104 (2d Cir. 2019).

---

its Rule 12(b)(6) analysis.  Dep't of State v. Muñoz, 602 U.S. 899, 908 n.4 (2024)

Factors to consider can include: (i) whether Congress provided an alternative means of enforcing the relevant provision; (ii) whether Congress created a cause of action in another section of the statute, thus suggesting the failure to do so in the relevant section was intentional; and (iii) whether the provision allegedly violated contains "rights-containing language" focused on "individuals protected."  Id.

However, a court "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided."  Olmstead v. Pruco Life Ins. Co. of N.J., 283 F.3d 429, 433 (2d Cir. 2002) (internal quotation marks and citations omitted).  In recent years, the Supreme Court has clarified that, "when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent."  Ziglar v. Abbasi, 582 U.S. 120, 131 (2017) (quoting Sandoval, 532 U.S. at 286).  Congress must have "'unambiguously conferred' 'individual rights upon a class of beneficiaries to which the plaintiff belongs.'"  Health & Hosp. Corp. v. Talevski, 599 U.S. 166, 183 (2023) (quoting Gonzaga Univ., 536 U.S. at 285-86).  Accordingly, there is a "strong presumption against creating private rights of action," Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 117 (2d Cir. 2007), and "implied rights of action are disfavored," Moya v.

U.S. Dep't of Homeland Sec., 975 F.3d 120, 128 (2d Cir. 2020) (internal quotation marks and citations omitted).  See also Lopez v. Jet Blue Airways, 662 F.3d 593, 596 (2d Cir. 2011).  Plaintiffs bear a "heavy burden . . . to demonstrate otherwise[.]"  Olmstead, 283 F.3d at 433.

Because plaintiffs concede that the AAPA does not contain an express right of action, Opp. at 21, the Court must "begin with the presumption that Congress did not intend one."  Bellikoff, 481 F.3d at 116.  Plaintiffs have failed to rebut this presumption.  The text of the AAPA does not evince a "clear manifestation of congressional intent" to create a private right of action.  Jet Blue Airways, 662 F.3d at 596.  Plaintiffs nonetheless urge the Court to find an implied right of action and argue that § 602(b)(2)(D)(ii)(I)(aa) and § 602 (b)(2)(D)(ii)(II)(bb) of the AAPA constitute "rights-creating language."  Opp. at 21-22.  In relevant part, § 602 (b)(2)(D)(ii)(II)(bb) reads as follows:

> The Secretary of State shall designate, in the Embassy of the United States in Kabul, Afghanistan, an Afghan Special Immigrant Visa Coordinator responsible for overseeing the efficiency and integrity of the processing of special immigrant visas under this section, who shall be given responsibility for ensuring

> that an applicant described in subclause (I) receives
> the information described in subclause (I)(aa)[.]

AAPA § 602 (b)(2)(D)(ii)(II)(bb). Section 602(b)(2)(D)(ii)(I)(aa), which describes the "information" referenced in § 602 (b)(2)(D)(ii)(II)(bb), reads as follows:

> An applicant who has been denied Chief of Mission
> approval shall receive a written decision that provides,
> to the maximum extent feasible, information describing
> the basis for the denial, including the facts and
> inferences underlying the individual determination[.]

AAPA § 602(b)(2)(D)(ii)(I)(aa).

Contrary to plaintiffs' suggestion, "rights-creating language" is that which "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case," or identifies "the class for whose especial benefit the statute was enacted." Cannon v. Univ. of Chicago, 441 U.S. 677, 688 n.9, 690 n.13 (1979). Moreover, statutes that "focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." Sandoval, 532 U.S. at 289 (internal quotation marks and citation omitted).

The AAPA lacks any rights-creating language "explicitly conferring" a right to applicants denied COM approval, and plaintiffs have identified no language suggesting that Congress

intended to do so.  Rather, read together, the subsections cited by plaintiffs merely focus on the "responsibility" that is "given" to the Afghan SIV Coordinator to disclose certain information. AAPA § 602(b)(2)(D)(ii)(II).  The focus of the AAPA's language is on the "person regulated," i.e., the Afghan SIV Coordinator, and does not explicitly confer a right directly onto any class of persons.  Even if the existing language could be so interpreted as phrased in explicit rights-creating terms, which it is not, a plaintiff must also show that the statute "manifests an intent 'to create not just a private right but also a private remedy.'" Gonzaga Univ., 536 U.S. at 284 (quoting Sandoval, 532 U.S. at 286). Plaintiffs have pointed to no such language in the AAPA manifesting any remedy-creating intent.

Also significant is the fact that the AAPA was codified in the Immigration and Nationality Act ("INA"), other portions of which contain explicit private rights of action.  Section 1421, for example, states that "[a] person whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United Stated district court[.]" 8 U.S.C. § 1421(c) (emphasis added).  See also 8 U.S.C. § 1324(b) ("[A]ny person alleging that the person is adversely affected directly by an unfair immigration-related employment practice . .

. <u>may file a charge</u> respecting such practice or violation with the Special Counsel[.]") (emphasis added).  Plaintiffs attempt to discount the significance of the existence of private rights of action in other portions of the INA by arguing that such rights are "not indicative of Congressional intent with respect to the AAPA."  Opp. at 22.  Not so.  Indeed, the existence of private rights of action in other portions of the INA shows that "Congress has demonstrated that it knows how to create a cause of action . . . when it wishes to do so."  <u>Hernandez v. Mesa</u>, 589 U.S. 93, 118 (2020) (Thomas, J., concurring).  This is powerful evidence that Congress's omission of legal authority for applicants denied COM approval was intentional.  In the absence of a private right of action, plaintiffs cannot bring a claim under the AAPA.

### b. Plaintiffs' Claim Under the APA

Plaintiffs also allege that defendants' failure to include a level of requisite information in the COM denial letters was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," and that the denial letters should be held unlawful under with the APA.  AC ¶¶ 161-62; <u>see also</u> Opp. at 6-10.  Defendants argue that the APA does not authorize review where, as here, the agency action, <u>i.e.</u>, visa processing and visa

policy, is committed to agency discretion.[6]    Mot. at 11-14.

Plaintiffs retort that defendants overstate the APA's exception

for agency actions committed to agency discretion.  Opp. at 6-10.

Generally, the APA "embodies a 'basic presumption of judicial

review.'"    Lunney v. U.S., 319 F.3d 550, 558 (2d Cir. 2003)

(quoting Abbott Laby's v. Gardner, 387 U.S. 136, 140 (1967)).

"This is just a presumption, however, and under [5 U.S.C.] §

701(a)(2) agency action is not subject to judicial review to the

extent that such action is committed to agency discretion by law."

Lincoln v. Vigil, 508 U.S. 182, 190-91 (1993) (internal quotation

marks and citation omitted).  This "very narrow exception" applies

where statutes "are drawn in such broad terms that in a given case

there is no law to apply."  Citizens to Pres. Overton Park, Inc.

v. Volpe, 401 U.S. 402, 410 (1971).  In other words, "review is

not to be had if the statute is drawn so that a court would have

no meaningful standard against which to judge the agency's exercise

of discretion."  Heckler v. Chaney, 470 U.S. 821, 830 (1985).  A

plaintiff must "specify some statute or regulation" that

meaningfully limits the relevant agency's discretion to show that

---

[6]    Defendants further contend that, even if review were available under the APA, consular nonreviewability would preclude such review.  As previously noted, the Supreme Court recently held that the "doctrine of consular nonreviewability is not jurisdictional."  Muñoz, 602 U.S. at 908 n.4.  Accordingly, the Court declines to examine the doctrine in the context of its Rule 12(b)(1) analysis.

the APA's judicial-review provisions apply.  Lunney, 319 F.3d at 558.

Courts will examine the "statute on which the claim of agency illegality is based" to determine whether § 701(a)(2) applies and erects a jurisdictional bar to review.  Webster v. Doe, 486 U.S. 592, 600 (1988).  In the immigration context, "[v]isa decisions are made by the political branches," Muñoz, 602 U.S. at 899, and agencies are given "wide discretion in the area of immigration processing," Saharia v. U.S. Citizenship & Immigr. Servs., 2022 WL 3141958, at *5 (S.D.N.Y. Aug. 5, 2022) (quoting Skalka v. Kelly, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017)).

Having examined the AAPA, it is clear that Congress has provided "no meaningful standard against which to judge" defendants' "exercise of discretion."  Heckler, 470 U.S. at 830. Indeed, the AAPA provides for the exercise of significant discretion by the COM designee.  Specifically, the COM is tasked with determining whether an applicant can move forward with the SIV process by verifying that the applicant meets the third criterion set forth in the AAPA: "faithful and valuable service" while employed by or on behalf of the U.S. government.  The

requirement for COM approval underscores the highly discretionary nature of the criterion itself.

The AAPA mandates that in order to verify "faithful and valuable service," the COM "shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity[.]"  AAPA § 602(b)(2)(D)(i).  That "risk assessment" necessarily requires the exercise of judgment and review of sensitive, and perhaps classified, materials.  Not only is there obvious discretion inherent in conducting that risk assessment to determine whether the applicant provided "faithful and valuable service," which ultimately bears on whether special immigrant status and entry into the U.S. is warranted, but there is also significant discretion in determining how much information to disclose to the applicant.  Put differently, the "risk assessment" conducted by the COM represents an analytical decision that is itself complex: both national security and the safety of the applicant alike could be imperiled by the exercise of incorrect judgment or the excessive disclosure of certain information relating to the U.S. government's interests and military operations in Afghanistan.

Plaintiffs nevertheless point to the provision of the AAPA stating that applicants "shall . . . receive" information

describing the basis for their COM denial as evidence of Congress' purported cabining of State Department discretion.  Opp. at 7. But plaintiffs' truncated quotation distorts the meaning of the provision.  The AAPA provides that, in the event of COM denial, applicants "shall . . . receive a written decision that provides, to the maximum extent <u>feasible</u>, information describing the basis for the denial, including the facts and inferences underlying the individual determination."    AAPA  §  602(b)(2)(D)(ii)(I)(aa) (emphasis added).    That disclosure requirement embodies substantial discretion relating to an armed conflict: the State Department must determine, what, if any, information can safely be disclosed to the applicant and further make an additional determination as to what level of disclosable information constitutes the "maximum extent feasible."

Plaintiffs insist that the Court need only review the denial letters to determine whether they are arbitrary, capricious, not in accordance with the law, or lacking in information required by statute.  Opp. at 10.  But the denial letters themselves plainly refute plaintiffs' position.  For example, the denial letter sent to plaintiff M.N.N. informed him that: "Given your employment was terminated for cause, you have not established that you meet the requirement of faithful and valuable service to the U.S. government

-26-

or the International Security Assistance Force (ISAF)/Resolute Support (RS)."  ECF No. 30-6.  Likewise, the denial letter sent to plaintiff S.D. stated that the COM "lack[ed] sufficient documents to make a determination" because S.D. "did not provide a valid employment letter" and the COM was "unable to confirm the authenticity of the employment document."  ECF No. 30-7.

Though plaintiffs allege that these explanations are insufficiently detailed, the AAPA provides no standard, and plaintiffs have failed to enunciate any meaningful standard, against which the Court could "judge the [State Department's] exercise of discretion" and determine whether the explanations contained in the denial letters are sufficient.  Heckler, 470 U.S. at 830.  Further, there is no standard by which the Court could determine whether the applicant was, in fact, already aware of the information provided by the COM in the denial letter.  It would be inappropriate for the Court to assume the role of factfinder at an initial step in the SIV process when the Court does not, and cannot, have a role to play in the ultimate decision of whether to issue a visa.

### c. Plaintiffs' Claim Under the Accardi Doctrine

Plaintiffs further argue that they state a claim for defendants' violation of the agency's own directive under the

principle set forth in U.S. ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954). AC ¶¶ 176-81; Opp. at 19-21. The Accardi doctrine teaches that "[u]nder deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 130 (2d Cir. 2020); see also U.S. ex rel. Accardi, 347 U.S. at 268. The doctrine is a "judicially-evolved rule ensuring fairness in administrative proceedings" by requiring "that the rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency." Montilla v. INS, 926 F.2d 162, 166-68 (2d Cir. 1991). Accardi and its progeny are not necessarily limited to the "rules attaining the status of formal regulations," and "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." Morton v. Ruiz, 415 U.S. 199, 235 (1974).

In support of their Accardi argument, plaintiffs point to an internal State Department cable, sent from the Secretary of State to Consular Section Chiefs at posts and COM Committees at U.S. embassies in Baghdad and Kabul, describing information that applicants who are denied COM approval should receive. Opp. at

19-21; ECF No. 23-1 ("Cable").  The relevant paragraph of the Cable

reads as follows:

> The [National Defense Authorization Act] 2014 requires
> that applicants denied COM approval receive a written
> decision with an explanation of the grounds for denial.
> The explanation, written by the COM, must contain, to
> the maximum extent feasible, [sensitive but
> unclassified] or lower information describing the basis
> for the denial, including the facts and reasoning
> leading to the denial.  The COM may not include in the
> denial notice any classified information or direct
> reporting that led to the denial.  Applicants denied
> based on classified information should be informed that
> the information leading to the denial may not be shared
> with the applicant due to its sensitivity.

Cable at 3.  In response, defendants contend as a preliminary

matter that the Accardi doctrine governs review of agency action

and does not provide an independent basis for jurisdiction.  Mot.

at 14-15.  Specifically, defendants point to caselaw describing

Accardi claims as arising under the APA.  Id.  Regardless,

defendants argue that because the Cable is an internal document,

it does not have the force of law and cannot form the basis for a

valid claim under Accardi.  Mot. at 14-15.

As made clear by the language of the Cable itself and the

context in which it was sent, the Cable is an internal document

devoid of language that either creates rights for applicants or

imposes obligations on the State Department.  Rather, the Cable is

intended to provide guidance to government personnel reviewing COM

applications and the sensitive documents and information contained therein.  Notably, the second sentence of the relevant paragraph of the Cable simply repeats the disclosure requirement already contained in the AAPA.    Cable at 3; see also AAPA § 602(2)(D)(ii)(I)(aa).  The third sentence mandates that the COM denial omit classified information or direct reporting.  Cable at 3.  And the fourth sentence states that applicants "should" be notified when information leading to the denial may not be shared due to the classified nature of that information.  Id.

Contrary to plaintiffs' assertions, that language does not impose a distinct obligation on government personnel, and it does not create a right on behalf of applicants.  Indeed, it merely repeats the AAPA's disclosure requirement, which is itself discretionary, and identifies certain additional information that "should" be provided to applicants in particular circumstances. In other words, there is no indication that the Cable was intended to have the force of law.  Accordingly, the Cable does not and cannot represent the type of regulation that Accardi and its

progeny are intended to cover.[7]  The Accardi doctrine is thus inapplicable and does not provide a cause of action to plaintiffs.

Further, Accardi claims are typically characterized as arising under the APA and thus do not provide an independent basis for jurisdiction here.  See, e.g., Fed. Defs. of New York, 954 F.3d at 130 ("When agencies fail to [follow their own regulations], the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance."); see also Caceres v. Joyce, 2025 WL 3171865, at *6 (S.D.N.Y. Nov. 13, 2025) ("[Plaintiff] brings an APA claim under the doctrine set forth in Accardi[.]"); Velesaca v. Decker, 458 F. Supp. 3d 224, 236 (S.D.N.Y. May 4, 2020) (analyzing the Accardi principle in the context of an APA claim). Accordingly, construing plaintiffs' Accardi claim as an additional APA claim, such a claim is barred for the same reasons as set forth above in Discussion Section I.b.  Namely, the APA does not

---

[7]  This conclusion is consistent with the holdings of other courts, including one in the Second Circuit, which employed the same rationale and held that because Accardi "generally does not apply to an agency's internal memoranda," a State Department cable could not provide the basis for an Accardi challenge. Sunny v. Biden, 2023 WL 5613433, at *3 (E.D.N.Y. Aug. 30, 2023) (citation omitted); see also United Afr. Org. v. Biden, 620 F. Supp. 3d 756, 774 (N.D. Ill. Aug. 9, 2022) (holding that neither internal operational directives nor a cable to COMs had the "force of law" and could not support an Accardi claim).

authorize review where, as here, the agency action, i.e., visa processing and visa policy, is committed to agency discretion.

## II.  Rule 12(b)(6)

As previewed above, defendants argue that the doctrine of consular nonreviewability precludes judicial review of the State Department's actions concerning COM approval.  Defendants incorporate the doctrine in support of two of their primary arguments: (i) first, defendants contend that finding an implied right of action to challenge the Afghan SIV process would be "particularly inappropriate" in light of the doctrine of consular nonreviewability; and (ii) second, even if the APA authorized review, the doctrine of consular nonreviewability would preclude such review.[8]  Mot. at 9-11, 14.  Specifically, defendants contend that consular nonreviewability prohibits judicial review of both the merits and non-merits components of the visa-issuing process. Id.  In response, plaintiffs contend that defendants overstate the applicability of consular nonreviewability doctrine and that the

---

[8]    Defendants additionally argue that, if the Court did not dismiss plaintiffs' non-FOIA claims on jurisdictional grounds and was inclined to examine the merits of plaintiffs' claims, dismissal would nonetheless be warranted on the independent basis that plaintiffs fail to state a claim because the explanations contained in the denial letters are sufficient.  Mot. at 17-19.  Because the Court concludes that plaintiffs' non-FOIA claims are, in fact, barred on jurisdictional grounds, the Court need not consider the merits and examine the contents of the COM denial letters.  The Court's 12(b)(6) analysis is accordingly limited to the doctrine of consular nonreviewability.

State Department's actions with respect to COM approval are, in fact, reviewable. Opp. at 10-13. Plaintiffs argue that the doctrine of consular nonreviewability does not extend to their claims concerning COM approval because (i) the COM approval process is "distinct" from the visa application process, and (ii) plaintiffs' claims concern a procedural requirement, i.e., the COM denial explanation, rather than the ultimate adverse determination on their COM applications. Id.

Under the doctrine of consular nonreviewability, "as a rule," a federal court "cannot review" "a consular officer's denial of a visa." Muñoz, 602 U.S. at 908. Consular nonreviewability recognizes that the "admission and exclusion of foreign nationals" is a "fundamentally sovereign attribute exercised by the Government's political departments largely immune from judicial control," and that courts have "no role to play 'unless expressly authorized by law.'" Id. (quoting Trump v. Hawaii, 585 U.S. 667, 702 (2018) and U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950)). In the Second Circuit, it is well-settled that consular nonreviewability applies to the "visa-issuing process,"

in which the "judiciary will not interfere."  Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1181 (2d Cir. 1978).

Defendants cite to a string of cases holding that consular nonreviewability precludes judicial review of even non-merits components of the visa review process, such as suits "challenging delays in the adjudication of a visa application."  Mot. at 10-11.  Defendants argue that such reasoning is applicable here, where plaintiffs challenge the "first step" in the SIV process.  Id. Plaintiffs contend that defendants' position has no precedential support and that courts in the Second Circuit have declined to extend consular nonreviewability to (i) decisions by non-consular officers, and (ii) immigration application decisions that precede visa applications, such as the denial or revocation of a Petition for Alien Relative or Petition for Non-Immigrant Worker.  Opp. at 10-13.

Plaintiffs' position that the COM application and review process falls outside the purview of consular nonreviewability because it has only a "distant connection to the visa process," Opp. at 10-13, is unavailing.  COM approval is clearly a part of the visa-issuing process because it is a necessary and initial step that applicants must take to participate in the SIV program. Indeed, the AAPA created COM approval, along with the remainder of

-34-

the steps of the SIV program, precisely for the sole purpose of screening applicants.  See AAPA § 602(a)(2)(D) (requiring that the recommendation or evaluation from a supervisor be "accompanied by approval from the appropriate Chief of Mission . . . who shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section").  Further, the text of the AAPA refers to COM approval as one of many "steps" related to the issuance of the SIV.  See AAPA § 602(4)(A) (stating that "all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.") (emphasis added).

Moreover, the State Department's website lists the "Steps of the Afghan SIV-Process" as follows: (i) "Pre-COM Application Process"; (ii) "COM Review – SIV Petition, Application Review & Decision"; (iii) "Visa Process – Part 1: Visa Application Process"; (iv) "Visa Process – Part 2: Appointment and Interview."  The Steps

-35-

of the Afghan SIV-Process.  In accordance with those steps, COM denial fully closes an individual's SIV application, subject only to an appeal of that decision.  Without COM approval, an individual cannot proceed to the visa interview and visa issuance steps of the SIV process.  See id. (directing applicants to "ask the Department of State to reopen the COM decision" in their appeal).

The cases cited by plaintiffs do not hold, or even suggest, that COM approval is not covered under the doctrine of consular nonreviewability.  Plaintiffs point to Coniglio v. Garland, 556 F. Supp. 3d 187, 201 (E.D.N.Y. 2021), for example, for the proposition that consular nonreviewability is "inapplicable to immigration applications that precede visa applications." Opp. at 11.  But in that case, plaintiffs challenged the USCIS's revocation of a Petition for Alien Relative.  Coniglio, 556 F. Supp. 3d at 191. The court based its reasoning, in part, on the fact that the two processes – the USCIS petition approval and consular visa issuance – were "authorized by different statutory subsections and accomplished by personnel attached to distinct agencies that are not even housed in the same Executive department."  Id. at 201. Such reasoning is plainly inapplicable here, where (i) an individual seeking an SIV emails their COM application to the National Visa Center (which is housed within the State Department),

(ii) that application is reviewed by the Afghan Special Immigrant Visa Unit (which is also housed within the State Department), and (iii) decided by the COM designee, who informs the National Visa Center if the application is approved or denied.  AC ¶¶ 39-47; see also The Steps of the Afghan SIV-Process.

It would strain logic and statutory interpretation to consider COM approval as anything but part and parcel of the visa-issuing process.  COM approval is a mandatory, initial, and discretionary step created by the AAPA solely for the purpose of screening individuals who wish to apply for the SIV program and determine whether they have, in fact, provided "faithful and valuable service to the United States Government."  In accordance with the Second Circuit's interpretation of consular nonreviewability as precluding judicial "interfer[ence] with the "visa-issuing process," Wan Shih Hseih, 569 F.2d at 1181, the doctrine provides another reason to foreclose a finding of an implied right of action in the AAPA.  And because the APA does not provide an "end-run around" consular nonreviewability, Yu Chu Hom v. Goldbeck, 2010 WL 2265054 at *4 (S.D.N.Y. May 28, 2010),

consular nonreviewability similarly bars review of plaintiffs' claims under the APA.

## III. Zone of Interests and Standing

Defendants also argue that IRAP fails to plausibly allege that it falls within the "zone of interests" intended to be protected by the AAPA, thus providing another reason for its non-FOIA claims to be dismissed.[9]   Mot. at 19-22.   Specifically, defendants contend that IRAP has no more than a "derivative" interest in applicants' rights, and that such an attenuated interest does not place IRAP within the AAPA's zone of interests and does not confer standing upon the organization.  Id.   In response, plaintiffs argue that IRAP falls squarely within the zone of interests of the AAPA and that, accordingly, it can bring claims under the APA.  Opp. at 13-17.  Specifically, plaintiffs argue that (i) IRAP has an interest in obtaining access to the COM denial information to prepare effective appeals, and (ii) that interest coincides with that of the applicants, who similarly seek effective review of their COM denials.  Id.  In the alternative, plaintiffs argue that it can assert third-party standing on behalf

---

[9]    Although the zone of interests test was formerly called "statutory standing," the Supreme Court has clarified that the question is not one of standing, but rather of whether a plaintiff "has a cause of action under the statute."  Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016) (citation omitted).  The parties here characterize the zone of interests test differently, but the analysis remains the same.

of its COM applicant clients.  Id. at 16-17.  Defendants respond to the third-party standing argument and argue that IRAP asserts standing on its right, rather than on behalf of its clients, and that in any event IRAP does not meet the standard for third-party standing.  Reply at 8-10.

Prudential limits on standing to sue are intended to limit a plaintiff's ability to sue to vindicate another's legal rights, to raise "generalized grievances," and to bring claims outside the "zone of interests" addressed by the statute in question.  Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (internal quotation marks and citations omitted).  "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  Id. at 127 (internal quotation marks and citations omitted).  The zone of interests test relies on the principle that a plaintiff cannot recover for injuries caused by the violation of a statute unless that statute "is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of harm which has in fact occurred as a result of its violation."  Id. at 130 n.5 (citations omitted).  For an APA claim specifically, the

relevant zone of interests is defined by the statute that the plaintiff claims was violated.  Fed. Defs. of New York, 954 F.3d at 128 (citations omitted).

The zone of interests test denies a right of review if a plaintiff's interests "are so marginally related to or inconsistent with the purposes implicit" in the statute that it "cannot reasonably be assumed that Congress intended to permit suit."  Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). Accordingly, the Court looks to the plain language of the AAPA. As discussed in Discussion Section I.a, the AAPA does not provide a private right of action.  Indeed, the AAPA is entirely devoid of language suggesting an intent to protect the rights of legal aid organizations such as IRAP.  IRAP asserts that while the relevant AAPA provision is intended to provide information to applicants who receive a COM denial, its own interest is "in obtaining the same information, to be used for the same purpose[.]"  Opp. at 14-15.  But this represents precisely the kind of "derivative" interest forming the "sort of claim" that the zone of interests test is designed to prohibit.  Moya, 975 F.3d at 132 (quoting Ctr. for Reprod. Law & Pol'y v. Bush, 304 F.3d 183, 196 (2d Cir. 2002)). Stated differently, the AAPA has no independent impact on IRAP and would not affect the organization if not for its mission of helping

applicants "prepare COM submissions" and "prepare for COM appeals." Moya, 975 F.3d at 132; Opp. at 14-15. Accordingly, IRAP lacks organizational standing and its non-FOIA claims must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to partially dismiss plaintiffs' claims is granted. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 28.

**SO ORDERED.**

Dated:   February 4, 2026
         New York, New York

_____
    NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE